UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN WILCOX,<br><br>             Plaintiff,<br><br>    v.<br><br>DEARBORN LIFE INSURANCE<br>COMPANY; AMGEN, INC. LIFE<br>INSURANCE PLAN,<br><br>           Defendants. | Case No.  2:21-cv-04605-JLS (JCx)<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW RE:<br>CROSS MOTIONS FOR<br>JUDGMENT (Docs. 38 and 46)** |

This action for arises out of Plaintiff Kevin Wilcox's life insurance policy, under the terms of which Plaintiff claims entitlement to continued coverage and waiver of the premium due to disability.  Resolution of whether Plaintiff is entitled to the waiver of the premium requires determination of whether Plaintiff remains "totally disabled" as that term is defined by the relevant policy.  The parties have filed opening and responsive briefs.  (*See* Docs. 38 & 47(Pltf.'s Op. and Resp. Br.); Docs. 46 & 47 (Def.'s Op. and Resp. Br.).)   Defendant filed the administrative record.  (*See* Doc. 44 (sealed).)  Plaintiff filed two notices of supplemental authority.  (Docs. 49 & 56.)  As set forth herein, the Court determines that Plaintiff has failed to establish he continues to be "totally disabled" as defined by the relevant policy.  As such, his claim for continued life insurance coverage based on a premium waiver is DENIED.

## I.     LEGAL STANDARDS

### A.     Federal Rule of Civil Procedure Rule 52

This matter is properly before the Court pursuant to Federal Rule of Civil Procedure 52.  Rule 52 motions for judgment are "bench trial[s] on the record," and the Court "make[s] findings of fact under Federal Rule of Civil Procedure 52(a)." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (*en banc*).  "In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true."  *Id.*

### B.     Standard of Review

The Court reviews this matter *de novo.*  Under a *de novo* standard of review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  That is, the Court "determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).  In doing so, the Court must focus on the rationale given to the claimant when benefits are denied or terminated, and it must determine whether the administrator's decision is supported by the record.  *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th Cir. 2022).

### C.     Burden of Proof

Plaintiff bears the burden of establishing by a preponderance of the evidence his entitlement to coverage and waiver of his life insurance premium (*i.e.*, that he was totally disabled under the relevant policy definition during the relevant time period). *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016); *Muniz*, 623 F.3d at 1294.  To do so, Plaintiff must establish that he was more likely than not "totally disabled" under the terms of the relevant policy at the time his coverage was revoked.  *See, e.g., Hart v. Unum Life Ins. Co. of Am.*, 253 F. Supp. 3d 1053, 1074 (N.D. Cal. 2017); *Porco v. Prudential Ins. Co. of Am.*, 682 F. Supp. 2d 1057, 1080

(C.D. Cal. 2010).

### D.    Evidence Considered by the Court

The Court generally limits its review to "the evidence that was before the plan administrator at the time [the] determination [was made]." *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007). Evidence before the Court need not be admissible under the Federal Rules of Evidence; instead, it "may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability." *See Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).

### E.    Analyzing Medical Evidence

A mere diagnosis is not dispositive of the issue of disability. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability. . . . A claimant bears the burden of proving that an impairment is disabling.") (internal quotation marks and citation omitted).

In performing a *de novo* review, the Court is not required to accept the conclusion of any particular treatment provider or medical file review. For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Instead, medical opinions "must . . . be accorded whatever weight they merit." *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing *Nord*).

The Court may give greater weight to a treating physician's opinion where it is evident a particular physician has had "a greater opportunity to know and observe the patient than a physician retained by the plan administrator" who conducts a file review. *Id.* (internal quotation marks omitted). However, where a treating physician lacks expertise in a particular area, and the plan's retained expert is a specialist in that area, it may be appropriate for a court to give greater weight to the specialist who merely conducts a file review. *See Nord*, 538 U.S. at 832.

Moreover, in cases such as this one, courts have noted an apparent tension

between treating physicians, who may tend to favor an opinion of "disabled" in a close case, and physicians who are routinely hired by plan administrators, who may favor a finding of "not disabled" in the same case. *See id.* It is therefore incumbent upon the Court to carefully assess and weigh all the evidence in light of the issues before the Court. Here, the Court has done so.

### F.     "Any Occupation"

The relevant definition has been the subject of much litigation. To qualify for continued coverage, Plaintiff must establish he is "completely unable because of Sickness or Injury to engage in any occupation for wage or profit or any occupation for which [he] become[s] qualified by education, training or experience." (632.) This definition has been routinely interpreted to include part time rather than full time work. *See Graeber v. Hewlett Packard Co. Emp. Benefits Org. Income Prot. Plan*, 421 F. Supp. 2d 1246, 1254 (N.D. Cal. 2006) (collecting cases), *aff'd*, 281 F. App'x 679 (9th Cir. 2008). The "any occupation" clause is found to mean "any job for which he was qualified by training, education, or experience." *See McKenzie v. General Telephone Co. of California*, 41 F.3d 1310, 1313 n.2, 1317 (9th Cir.1994) (interpreting a definition of disability stating that a claim must be "completely unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are or become reasonably qualified by training, education or experience"), *overruled on other grounds by Saffon v Wells Fargo & Co. Long Term Dis. Plan*, 522 F.3d 863, 872 n.2 (9th Cir. 2008). References in an "any occupation" clause to the insured's "education, training or experience" necessarily requires consideration of those unique characteristics. *Pannebecker v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1213, 1220 (9th Cir. 2008) ("[A] plan that incorporates 'training, education, or experience' requires some individuation in the analysis.")

### G.     Communication Regarding Claim Denial

ERISA requires specific information be communicated to an ERISA participant who is denied benefits. In addition to providing the plan or policy provisions

implicated by a claim, the administrator must set forth the specific reason for the denial. *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (explaining the requirements of 29 C.F.R. § 2560.503-1(f)). The claimant must also be provided with a description of any additional information needed for a claimant to perfect his claim (and why the information is necessary). *Id.* A claimant must also be provided with information regarding how to seek review of the decision. *Id.*

The communication with the claimant limits the arguments available to the plan administrator in subsequent litigation. Courts are directed to focus the analysis regarding an ERISA claim-for-benefits on the record before the plan administrator and the rationale given to the claimant by the plan administrator when benefits are denied or terminated. *Collier*, 53 F.4th at 1182.

## II.   FINDINGS OF FACT AND DETERMINATION OF ENTITLMENT TO CONTINUED COVERAGE

In relevant part, the evidence before the Court may be summarized as follows.

### A.   Policy Language and Claim Chronology

Plaintiff was the Director of Employee Benefits at Amgen Corporation when he ceased working in 2012. (AR 707).[1] At that time, Wilcox had a Master's Degree in Business Administration and had been with Amgen for eight years. (1484.) Workplace discord contributed to his disability, which included, according to Plaintiff, panic attacks, difficulty completing work tasks, and lack of concentration both at home and at work. (1224.)

At the time he stopped working, Wilcox was covered as a Participant in Defendant Amgen, Inc. Life Insurance Plan, which was, in turn, insured by Defendant Dearborn Life Insurance Company ("Dearborn"). The relevant life insurance policy ("the Policy") provided continuation of coverage and waiver of premium under certain circumstances:

---

[1] All pinpoint citations to the record are citations to the administrative record, filed by Defendant Dearborn Life Insurance Company. (*See* Doc. 44 (sealed administrative record).)

> We will continue Your Basic and Supplemental life insurance benefit and
> Dependent Life Insurance, if applicable, under the Policy without further
> payment of life insurance premium if You become Totally Disabled, [if]
> . . . You provide Us with satisfactory written proof of within 12 months
> after the date You became Totally Disabled . . . and . . . Your Total
> Disability has continued without interruption for at least 9 months . . .
> You are still Totally Disabled when You submit the proof of disability.

(632 (emphasis omitted, paragraph structure altered).)  The Policy defines "Totally
Disability":

> Total Disability or Totally Disabled means You are diagnosed by a
> Doctor to be completely unable because of Sickness or Injury to engage
> in any occupation for wage or profit or any occupation for which You
> become qualified by education, training or experience.

(632.)  The Policy allocates the burden of establishing Total Disability to the
Participant.  (AR 632 ("You are responsible for obtaining initial and continuing proof
of Total Disability.").)

Dearborn assessed and approved Plaintiff's initial claim[2] and continued it for
other time periods:

| | |
|---|---|
| 11/27/13 | Extended through 01/01/14.  (1808.) |
| 06/24/15 | Extended through 09/30/14.  (1716.) |
| 10/05/15 | Extended through 10/01/17.  (1791.) |
| 03/08/18 | Extended through 10/01/19.  (1660.) |

In July 2019, Dearborn asked Plaintiff for additional information for Dearborn's
continuing review.  (1621-1622.)   In response, Wilcox provided Dearborn with
additional documentation of his disabilities and how they prevented him from
working.  (1479-1485, 1145-1185).

---

[2] Neither party cites to the initial approval letter, but both agree the claim was approved.

On February 5, 2020, Dearborn terminated Plaintiff's coverage,[3] claiming that he no longer met the policy's definition of "totally disabled." (1626-1629.) Of note, Dearborn acknowledged that Plaintiff's "return to [his] previous occupation may not be possible at [that] time," but also noted that he "retain[ed] a level of function that would permit [him] to perform other[,] less demanding work in another occupation." (1627.) Dearborn's letter noted improved neuropsychological functioning documented in 2018 and remission of depressive condition and anxiety in 2019. (1627.) It also noted Plaintiff's ability to use a computer, to write by hand, and lack of difficulties with fine motor tasks. (1627.)

On February 3, 2021, Plaintiff appealed Dearborn's termination of his coverage and submitted follow up medical evidence. (1543-46.) Dearborn denied his appeal. (1664-1672.) In doing so, Dearborn relied on the reports of its reviewing physicians. It noted that Plaintiff's claim of continuing total disability as to "any occupation" was not supported by the office notes or objective medical evidence during the relevant time period. It specifically differentiated between medical (physical) conditions and psychiatric conditions, concluding that neither supported a finding of total disability. Of note, Plaintiff's subjective complaints of severe and chronic diarrhea were rejected on the basis of the lack of documentation of weight loss, laboratory abnormality, or dehydration due to this issue.

After Dearborn denied Plaintiff's appeal, this suit followed.

### B.    Medical Evidence

The administrative record is in this case is voluminous, spanning about eight years, and totaling almost 1,900 pages. Because the only relevant determination is whether Plaintiff continued to be totally disabled as defined by the Policy as October 1, 2019 and beyond, not all the medical evidence is summarized here. Instead,

---

[3] The letter lacks a definite effective date of the termination; it does not specify if the termination was to be effective as of October 1, 2019, the ending date of the last extension, or February 5, 2020, the date of the letter. Because this is a question of life insurance coverage and not a question of eligibility for long-term disability benefits, the imprecision is inconsequential. The Court's analysis would be the same regardless of which of these dates are considered.

historical medical evidence is discussed only to the extent relevant to the Court's analysis. The most relevant medical evidence is summarized below in chronological order.

09/26/14    Neuropsychological assessment report by Nicholas Thaler, Ph.D. (1348-1351.) Dr. Thaler indicated that the results of neuropsychological tests were invalid. Specifically, he noted that Plaintiff "failed his measures of performance validity" as to this testing. (1350.) Dr. Thaler offered two alternative reasons for the invalidity: "This indicates that the patient was likely not attending to test stimuli, or [was] purposefully failing [in order] to project an image of significant cognitive dysfunction." (1350.) Dr. Thaler did not opine as to which alternative he believed explained the results; instead, he noted both that Plaintiff's "poor scores [were] not congruent with his observed functioning" and that Plaintiff "may be eligible for neuropsychological testing at a later point, if he approaches testing with the proper care required for valid results." (1350-1351.)

04/23/2015    Neuropsychological assessment report by Jane Lewis, Ph.D. (46-57.) In contrast to the earlier testing by Dr. Thaler, Dr. Lewis reported that Plaintiff passed objective validity measures as to this testing. (51 (noting that Plaintiff "was pleasant and cooperative with all that was requested of him, and he appeared to be putting forth his best efforts, which is supported by his passing the TOMM and the Reliable Digit Span measures"); *see* 55 ("There is no evidence he was exaggerating the level of his cognitive deficits.").) Dr. Lewis assessed Plaintiff as functioning at the "[l]ow [a]verage range of intellect," which was "dramatically lower than his pre-morbid level of functioning." (56.) Dr. Lewis elaborated that Plaintiff's "cognitive functioning deficits are most dramatic in areas of attention and concentration and the learning of new information, as well as in processing speed and executive functioning." (56.) Dr. Lewis

recommended that Plaintiff "[a]dher[e] to a structure and continu[e] to reduce stress." (AR 57.)

| | |
|---|---|
| 03/14/16 | Completed "HIV Residual Functional Capacity Questionnaire" by Dr. Bruce Williams. (1547-1554.) Overall, Dr. Williams evaluated Plaintiff as having a fair prognosis. Plaintiff was noted to suffer from pain/paresthesia ("pins-and-needles" sensations), encephalopathy characterized by cognitive or motor dysfunction that limits function and progresses, chronic diarrhea, dry mouth, nausea, and decreased libido. Dr. Williams believed Plaintiff had limitations of activities of daily living, social functioning, completing tasks in a timely manner as a result of peripheral neuropathy, involuntary weight loss, pain, and insomnia. He also rated Plaintiff being severely limited in his ability to deal with work stress, and that he would be unlikely to be able to work regularly, get to work on time, having his performance supervised, remaining at the workplace for a full day, and dealing with others appropriately. Dr. Williamson believed that emotional factors contributed to Plaintiff's symptoms and functional limitations, and that Plaintiff's symptoms would constantly interfere with his attention and concentration. He expected Plaintiff's symptoms to last at least 12 months. He assessed Plaintiff's functional limitations as follows: able to walk 0-1 city blocks without rest, able to sit for 10 minutes, able to stand for 20 minutes, and during an eight-hour work day, to sit and stand or walk for less than 2 hours. Dr. Williams explained Plaintiff's decreased concentration led to agitation and inability to work. Plaintiff could lift ten pounds or less occasionally, he had minor limitations on using hands, fingers, arms, and bending and twisting at the waist. Dr. Williams believed Plaintiff should avoid all exposure to such things as extreme cold and heat, chemicals, cigarette smoke, and odors. Plaintiff could be expected to miss more |

than three days per months due to his impairment or treatment.  Dr. Williams explained Plaintiff had difficulty concentrating, decreased memory, and frequent agitation related to anxiety.

03/28/18   Neuropsychological Evaluation Report by Robert Thoma, Ph.D.  (1164-1171.)  On good effort and passing built-in measures of validity (1166), Dr. Thoma noted that Plaintiff exhibited "significantly better functioning across all cognitive domains" since the testing in 2015.  (1170.)  Dr. Thoma attributed this, at least in part, to "reduced psychosocial stress." (1170.)  Dr. Thoma noted that Plaintiff's "[o]verall . . . neuropsychological functioning . . . was in the average range," but that although Plaintiff's functioning did not indicate impairment, it "was below expectation."  (1170.)  Although executive functioning was within expectation overall, certain scores indicated that Plaintiff had "difficulty with activities and tasks involving sustained attention, impulse control, emotional regulation, organization, and planning."  (1170.)  Dr. Thoma was also of the opinion that Plaintiff's condition could "leave him susceptible to disrupted attention and perhaps variability in those symptoms related to acute levels of distress, fatigue, or medical/metabolic functioning at any given time."  (1170.)  Notably, Dr. Thoma confirmed "a discrepancy between premorbid levels of functioning and current levels of cognitive functioning [that were] consistent with his previous diagnosis of cognitive disorder [not otherwise specified]."  (1170.)  Thus, Dr. Thoma noted that "an updated diagnosis of . . . Mild Neurocognitive disorder due to HIV infection [to be] most consistent with the [observed] results" of the testing.  (1170.)

06/12/19   Behavioral Health Note signed by Brant Hager, MD, psychiatrist, and Ruston Mitchell, LCSW.  (1154-1157.)  Dr. Hager notes diagnoses of recurrent depressive disorder and mild neurocognitive disorder due to

HIV.  (1154.)  The form does not specify a return-to-work date for full time or part time work; instead, it states:  "N/A" for "not applicable."  (1154.)  Dr. Hager opined that "testing suggests difficulty with activities and tasks involving sustained attention, impulse control, emotional regulation, organization, and planning.  (1154.)  He states that Plaintiff's "current limitations are based on neurocognitive disorder and return to work [is] not advised."  (1154.)  Other impairments limiting work activity are described as "depressed mood, anhedonia [(inability to feel pleasure), and] fatigue."  (1155.)

| | |
|---|---|
| 06/21/19 | Attending Physician's Statement by Tracy Carlson, MD.  (1145-1153.)  Dr. Carlson is Plaintiff's primary care physician.  (1151.)  Dr. Carlson noted Plaintiff's diagnoses as HIV, HIV-associated neurocognitive disorder, and HIV-associated peripheral neuropathy.  1145  She listed subjective symptoms as including "pain, paresthesia [("pins-and-needles" sensation caused by nerve damage)], confusion, disorientation, impaired concentration, [and] impaired decision-making."  1145  Dr. Carlson referred to Dr. Thoma's neuropsychological tests to point out Plaintiff's "impaired immediate memory" and "impaired attention, impulse control, emotional regulation, organization, [and] planning."  1145  She noted that Plaintiff was unable to drive and required assistance with finances and other complex decisions.  1147  She further opined that she expected his restrictions to be "lifelong."  1147  She reported that "he has exacerbation of neuropathy symptoms if he stands or walks for more than one hour at a time," and that he also "reports fatigue and pain after 2 hours of sitting."  (1151.) |
| 08/30/19 | Emergency Department Note by Miryam Miller MD.  Plaintiff fell off a stepstool, resulting in minor injury.  (*See* 812-17.) |
| 02/03/20 | Dearborn file review by Colton Edwards, RN BSN.  (1819-1821.)  Nurse |

Edwards reviewed, *inter alia*, Dr. Carlson's June 21, 2019 note.  Nurse Edwards' summary of Dr. Carlson's statement includes the inaccurate statement[4] that Dr. Carlson had "[n]ot advised [Plaintiff] to reduce or cease work or work light duty." (1820.)   Overall, Nurse Edwards assessed Plaintiff as not meeting the definition of total disability:

> The patient has a history positive for HIV and reportedly had worsening concentration and memory over time. The neuropsychological evaluation dated 03/28/18 stated that he was experiencing significantly better functioning across all cognitive domains since a previous evaluation in 2015. This was thought to be likely secondary to treatment and reduced psychosocial stress. Mild cognitive disorder due to HIV infection was considered an appropriate diagnosis at this time. Some anxiety and depressed mood were noted on progress notes, though these findings were not consistent and no other signs of functional impairment related to psychological condition were indicated.  As of 02/21/19 his chronic depression with anxious quality was noted to be stably remitted, though he began psychotherapy in late June 2019 for cognitive impairment, depressed mood and anhedonia, and fatigue. As of 07/30/19, therapy showed slight progress with the patient reporting an overall decrease in depression and anxiety symptoms. These findings are not supportive of a level of dysfunction significant enough to preclude his ability to perform the duties of any occupation.

(1821.)

11/19/20   Letter from Dr. Carlson submitted with Plaintiff's appeal.  (1557-1559.)

---

[4] Dr. Carlson wrote on the form "unable to work" without equivocation and she answered "no" to a question addressing whether Plaintiff "could . . . resume some/all work duties while continuing with treatment."  (1147.)

Therein, Dr. Carlson discusses at length her assessment of Plaintiff's health and ability to work.  According to Dr. Carlson, Plaintiff continued to suffer from HIV-associated cognitive disorder resulting in deficits in attention, memory, impulse control, emotional regulation, organizing, and planning.  (1557.)  She noted that Plaintiff continued to suffer from chronic and unpredictable diarrhea due to HIV-related enteropathy. (1557.)  Dr. Carlson opined that even with Plaintiff's management of his condition with adult diapers, this condition "would impair his ability to perform work that required in-person meetings, travel, or prolonged periods of uninterrupted time at a desk."  (1558.)  Dr. Carlson further noted that Plaintiff suffered from chronic pain in the knees and feet due to osteoarthritis and HIV-related peripheral neuropathy, respectively, limiting his stamina for standing and walking.  (1557.)  Although no longer suffering from major depression, Plaintiff continued to suffer from anxiety and depression, which was improved with medication, but exacerbated by stress.  (1557.)  Dr. Carlson recounted Plaintiff's credible accounts to her of difficulty with memory tasks, organization, understanding multi-step processes, impulse control, and emotional regulation.  (1557.)  Based on this, Dr. Carlson states that:  "In my professional opinion, these deficits would significantly impair his ability to work that required concentration, decision-making, and/or memory." (1558.)  Declining to provide specific limitations as to sitting, standing, walking, lifting, and manual dexterity in favor of an occupational therapy assessment, Dr. Carlson noted that Plaintiff's "principal disabilities are cognitive and gastrointestinal."  (1558.)  She also opined that "[c]hronic pain would likely impose significant physical restrictions on the work he would be able to perform." (1558.)

| 01/26/21 | Letter from Dr. Hager submitted with Plaintiff's appeal.  (1560.)   Dr. |

Hager states that he is limited in the information he could disclose: "The details of [Plaintiff's] care are protected under law. For the purpose of this letter, Mr. Wilcox has permitted me to disclose the following." (1560.) Dr. Hager notes that the use of the word "mild" to describe Plaintiff's condition should not be read to imply the absence of functional deficits. (1560.) Dr. Hager clarified that "*Mild* Neurocognitive Disorder due to HIV" is only mild in comparison to more severe cases of the same disorder. (1560.) Dr. Hager clarified that his June 2019 paperwork, in which Dr. Hager recommended Plaintiff not return to work, "was based on the presence of both a neurocognitive disorder and depressive disorders." (1560.) Dr. Hager stated that the neurocognitive disorder "was likely to prohibit [Plaintiff] from functioning at his previous level of employment," and the depressive disorders "were likely to exacerbate in the context of work related stress." (1560.)

03/11/21  Report from Dearborn's reviewing psychiatrist, Eric M. Chavez, M.D. Dr. Chavez opined that Plaintiff has "no psychiatric diagnoses affecting [his] functional level." (1826-1831.) Dr. Chavez referenced Plaintiff's psychiatrist's documentation of remission of Plaintiff's persistent depressive disorder, as well as psychiatric and therapy progress notes that "consistently documented a normal mental status exam." (1829.) In noting that Plaintiff's depression and trouble with memory did not cause functional impairment, Dr. Chavez referred to the treatment notes in the record. (*See* 1829 (relying on a 02/21/19 note regarding Plaintiff's "sustained improvement in depression symptoms," a 07/11/19 note regarding the provider discussing with Plaintiff ways to address memory issues, a 07/16/19 note discussing similar topic, a 07/23/19 note that Plaintiff's mental status exam was normal, a 07/29/19 note from psychiatrist visit reporting excellent control of chronic depression

symptoms,  and a 07/30/19 note regarding the provider discussing using exercise to decrease anxiety and depression).)   Dr. Chavez noted that neuropsychological testing from 2018 showed average function in all areas of testing, and showed improvement from 2015, possibility attributable to resolution of psychiatric symptoms.  (1830.)

03/12/21      Report from Dearborn's reviewing physician, Joseph Lee (1832-1835.) Dr. Lee, internist, opined that Plaintiff's medical doctor's chart notes did not support finding that Plaintiff's non-psychiatric medical conditions (identified as "debilitating diarrhea, peripheral neuropathy, and osteoarthritis") "reach[ed] a level that would result in any physical functional impairment."  (1833.)  Dr. Lee based this opinion on the absence of "objective findings in the form of vitals, exam findings, labs, or imaging findings to support any physical function impairment,"  and he further noted that Plaintiff's physical exams were unremarkable. (1833.)  Specifically, as to objective findings, Dr. Lee noted that a blood count showed Plaintiff's HIV was "not active"; as to Plaintiff's other medical conditions, Dr. Lee noted the lack of objective evidence. (1834.)  As to the chronic diarrhea, Dr. Lee notes the absence of documented weight loss, laboratory abnormalities, or dehydration.  As to the osteoarthritis, he notes that no imaging was provided, that the records did not document the manner or extent to which this condition limited Plaintiff.  (1834.)  Finally, Dr. Lee noted a lack of documentation as to how Plaintiff's peripheral neuropathy limited Plaintiff's functioning. (1834.)

## III.   CONCLUSIONS OF LAW AND TERMINATION OF COVERAGE

The Policy is an "employee welfare benefit plan" governed by ERISA.  *See* 29 U.S.C. § 1002(1).

Upon review of the administrative record, and applying the legal standards set

forth herein, the Court concludes that Dearborn properly terminated Plaintiff's life insurance coverage. Both ERISA and the Policy language allocate to Plaintiff the burden of establishing continuing total disability from performing any occupation. Plaintiff failed to submit sufficient proof that he continued to be totally disabled as defined by the Policy after October 1, 2019. Dearborn's decision to terminate Plaintiff's coverage was consistent with the Policy language and the evidence of record.

## A. Dearborn's File Reviewers Identified Reasons to Find that Plaintiff Was Not Totally Disabled from Performing "Any Occupation"

As noted above, Dearborn had both a psychiatrist and an internist review Plaintiff's file. Reviewing Dr. Williams's 2016 HIV Functional Residual Capacity form (summarized above) and more recent records, Dr. Chavez opined that the medical records showed that Plaintiff had "no psychiatric diagnoses affecting [his] functional level." (1829.) Although Plaintiff had suffered from major depressive disorder, Dr. Chavez pointed out that a February 29, 2019 office note that showed improvement in his symptoms of depression, noted as remission of Plaintiff's depressive disorder; Dr. Chavez also referred to an office note dated July 26, 2019 that "reported excellent control of his chronic depression symptoms." (1829.) Dr. Chavez noted that the 2018 neuropsychological testing showed functioning in the average range which, although lower than expected, did not indicate impairment. (1830.) Dr. Lee's review found an absence of chart notes that would support a finding that Plaintiff suffered from debilitating diarrhea, peripheral neuropathy, and osteoarthritis to the extent that would restrict him from working. (1833-34.)

## B. Plaintiff Did Not Met His Burden of Proof

The law allocates the burden of proving he is disabled to Plaintiff. The Policy reiterates this burden. The review undertaken by Dearborn in February 2020, just before reaching the decision to terminate Plaintiff's coverage, included medical records only through the end of August 2019. (1626-1629 (Feb. 5, 2020 denial letter);

*see also* 1826-1831 (Dr. Chavez review of medical records); 1832-1835 (Dr. Lee review of medical records).)  Thus, Dearborn expressly informed Plaintiff that a reversal of the denial and "a favorable decision" would require, "[a]t a minimum," the submission of certain up-to-date records, including "[p]sychological reports, office notes, GAF scores from 9/1/2019 to the present[, and a] Functional Capacity Evaluation."[5]  (1627.)

Plaintiff did not provide the information specified by Dearborn.  Instead, Plaintiff submitted a letter from his disability insurer that found him disabled under the terms of the relevant policy, Plaintiff's personal statement, and updated letters from his psychiatrist and his primary care physician.  Plaintiff did not provide updated GAF scores or an updated functional capacity evaluation.  His doctors' letters did not include any office notes or reports.  As discussed below in a separate section, the evidence submitted by Plaintiff did not establish his continuing total disability under the terms of the Policy after October 2019.

On this issue of burden of proof, Plaintiff argues that Dearborn failed to engage in a "meaningful dialogue" with Plaintiff regarding a claim.  (Pltf. Op. Br. at 16-17 (relying on *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).)  *Booten* used this phrase to refer to the ERISA regulations that set forth specific requirements for denial of ERISA claims:

> Under federal law, an ERISA plan "shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an

---

[5] GAF scores are Global Assessment of Functioning scores that measure how a person's psychological symptoms impact their daily lives.  A functional capacity evaluation is an evaluation of a person's physical capacity in relation to a job's demands, often expressed in ability to lift, carry, push/pull, and balance, as well as an assessment of fine motor skills and cardiovascular tolerance.

explanation of why such material or information is necessary; and
(4) Appropriate information as to the steps to be taken if the participant
or beneficiary wishes to submit his or her claim for review." 29 C.F.R.
§ 2560.503-1(f).

*Booton*, 110 F.3d at 1463.  Here, in its February 5, 2020 denial, Dearborn addressed
these requirements, including the specific post-August 2019 medical evidence it
required, but Plaintiff, represented by apt counsel, failed to submit it.  Instead, almost
a full year later, on February 3, 2021, Plaintiff's counsel sent the appeal letter to
Dearborn and, despite having been advised of the need for these specific records, no
such records were provided.  The records Plaintiff did provide were insufficient.

### 1.   Updated Medical Records Provided by Plaintiff Did Not Satisfy His Burden

The materials sent by counsel do not establish continuing total disability.  (*See*
1543-46 (counsel's letter to Dearborn), 1555-1556 (Pltf. Stmt.), 1557-1559 (Dr.
Carlson), 1560 (Dr. Hager), 1562 (Unum approval letter noting the end of the
maximum benefit period in February 2027 and advising regarding the necessity of
periodic review but otherwise not assigning an end date to Plaintiff's long-term
disability benefits).)

The letter from Plaintiff's psychiatrist, Dr. Hager, did not include any office
notes showing recent treatment of Plaintiff.  Instead, Dr. Hager explained that a past
diagnosis nominally referred to as "mild" should be considered "mild" only in a
relative sense, and that even a "mild" neurocognitive disorder can be disabling.  Dr.
Hager implied he could not provide a full update due to constraints on the release of
information placed by Plaintiff and/or Plaintiff's counsel.  Importantly, Dr. Hager
refers pointedly to Plaintiff's functioning as related to his previous level of
employment.  (1560 (noting that "the presence . . . a neurocognitive disorder . . . was
likely to *prohibit him from functioning at his previous level of employment*")
(emphasis added).)  But in light of the "any occupation" definition at issue,

Dr. Hager's express reference to Plaintiff's previous level of employment is unhelpful to Plaintiff's claim.  Dr. Hager does opine that work-related stress can contribute to a finding that Plaintiff is disabled, but this observation is insufficient to establish that Plaintiff meets the definition of total disability under the "any occupation" definition. The letter from Plaintiff's primary care physician, Dr. Carlson, likewise did not provide any office notes suggesting recent treatment of Plaintiff.  Dr. Carlson outlined a number of obstacles Plaintiff would face if he returned to work, but she stopped short of identifying the scope of debilitating effects of his neurocognitive and physical conditions that would prevent Plaintiff from undertaking employment under the "any occupation" standard.  Moreover, although Plaintiff implies that Dr. Carlson's letter should be read as an updated functional capacity evaluation, it is not.  (*See* Pltf. Op. Brief at 7-8.)   In his opening brief, Plaintiff discusses a 2016 functional capacity evaluation by Dr. Williams, authored five years before the appeal, and Plaintiff characterizes Dr. Carlson's letter as an "update" to that functional capacity evaluation. However, although Dr. Carlson indeed stated that her letter "serve[d] to update" Dr. Williams's 2016 report, it is clearly insufficiently detailed to serve as an "updated" functional capacity evaluation.  Instead, she defers identification of specific limits on Plaintiff's functionality to an occupational therapist.  Specifically, in her letter, Dr. Carlson expressly disavows any opinion as to "specific limitations as to sitting, standing, walking, lifting, and manual dexterity," stating that such an assessment should be conducted by one specialized in occupational therapy.  (1558.) Overall, although Dr. Carlson's letter is supportive of Plaintiff's claim, it does not establish the level of total disability required under the "any occupation" standard.

### 2.     Plaintiff's October 2020 Statement Did Not Satisfy His Burden of Proof

It is clear from the denial letter that Dearborn considered Plaintiff's October 2020 statement, but found Plaintiff's subjective account of his symptoms to be at odds with the medical evidence of record.  Notably, there is a *lack* of office notes or

treatment notes beyond 2020, and this is a basis for rejecting Plaintiff's statements as being inconsistent with the medical evidence of record for the relevant time period.

Plaintiff argues that Dearborn's litigation position is at odds with its denial letters in that Dearborn's file reviewers did not attack the credibility of Plaintiff and his doctors, but in litigation, Dearborn does.  (*See* Pltf. Resp. Br. at 3-4 (relying on *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905-06 (9th Cir. 2016)); *see also* Doc. 56, Pltf. Supp'l Authority (relying on *Collier*).)  The Court disagrees.  Although Dearborn's denial letter did not expressly reject Plaintiff's subjective account of his symptoms by attacking Plaintiff's credibility, neither did Dearborn rely on Plaintiff's subjective account.  Instead, Dearborn relied on the analyses of its medical file reviewers, who set forth reasons, found in the medical evidence of record, for rejecting Plaintiff's subjective reports.  (*See* 1669-1670.)

Plaintiff argues that office notes are not meant to document disability; they are meant to facilitate treatment.  Plaintiff relies on *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007), which notes that "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations."  Although this is no doubt true, treatment notes provide contemporaneous descriptions of a patient's symptoms and concerns, as well as the treatment chosen by the patient and doctor to address those symptoms and concerns. As such, they are evidence of a patient's diagnoses, concerns, symptomology, and treatment.  To be clear, a claimant's subjective statements about his or her symptoms and limitations, without more, can be reliable evidence of disability.  Such statements tend to be more reliable when supported by contemporaneous office notes or treatment notes. And although not all symptoms and limitations can be objectively measured, when subjective reports are corroborated by objective data, the subjective reports are more reliable still.  The Court's role here is to determine whether Dearborn's decision is supported by the record notwithstanding Plaintiff's subjective account of his symptoms.  *See Collier*, 53 F.4th at 1182.

In his statement, Plaintiff reported the following:  that he's not been able to drive since 2013, that his spouse quit his job to take care of him full time in 2014 due to his cognitive decline; that "since 2012, [he has] lost all control of [his] bowels and bladder"; that he has frequent falls from peripheral neuropathy and has "pain at a level 6 of 10 on most days;" and that he also has severe outbreaks of psoriasis.  These subjective complaints are not supported by contemporaneous office notes for the relevant time period.

Although there are no medical records from the relevant time period, one issue discussed by Plaintiff does appear consistently throughout Plaintiff's medical history. Plaintiff has reported chronic and unpredictable diarrhea, but the severity of this condition is not documented at the level complained of by Plaintiff in his October 2020 statement, and the record instead reflects that the problem was more pronounced at some times than it was at others.  Some notes reflect the problem was not severe or was not severe at the time the notes were made.  (*See, e.g.,* 85 (stools solid since beginning acupuncture, noted 07/25/2016), 131 & 135 ("occasional diarrhea" and "chronic diarrhea remains unchanged," noted  09/19/17), 179 (no nausea/vomiting /diarrhea, noted 02/17/2017), 916 "negative for . . . diarrhea," noted 11/16/18), 781 (no diarrhea, noted 11/28/18), 876 "negative for . . . diarrhea," noted 07/26/19).  In contrast, the diarrhea is noted to be a greater problem at other times, and those reports generally support for Dearborn's contention that the complaints reference more severe diarrhea when made in connection with with Plaintiff's applications for disability benefits.  (*See, e.g.,* 1451 ("I wet my pants at least once per day . . . I poop my pants at least 2x," from a  04/05/13 statement to doctor administering neuropsychological testing), 1531 ("Diarrhea (diagnosed as HIV enteropathy by Dr Anton, needs followup," noted on 02/24/15), 1332 ("HIV-related enteropathy" on "PROBLEM LIST" from 12/14/2015), 1549 (diarrhea lasting one month or longer, noted on 03/04/2016 on Social Security form), 220 ("He is requesting disability on the basis of persistent neuropathy, urinary incontinence, diarrhea (4-8 per day)" noted on 03/4/16),

1267 (note from 07/13/17 "He continues to have diarrhea approximately 8 times a day due to his HIV enteropathy. He is therefore unable to sit for more than about 2 hours at a time. This would make it extremely difficult to sustain gainful employment."), 1466 (on form seeking life insurance premium waiver, "surprise bowel issues about every 2 hours" noted on 08/21/2017).) In short, Plaintiff's emphatic statements in October 2020 regarding his chronic and consistent diarrhea do not match the medical evidence of record, which reflects that the condition was at times asymptomatic and which does not reflect the dramatic, life-altering bowel incontinence described by Plaintiff in his statement.

In the end, notwithstanding his personal statement, Plaintiff failed to support his October 2020 statement with contemporaneous treatment records beyond June 2019. Therefore, the Court concludes that Dearborn's determination that Plaintiff failed to establish he continued to meet the definition of totally disabled, and its consequent decision to discontinue Plaintiff's life insurance premium waiver, is supported by the record.

## IV. CONCLUSION

As set forth herein, the Court concludes that Dearborn properly discontinued Plaintiff's life insurance premium waiver. Dearborn shall prepare and lodge a proposed judgment within seven days of the entry of this Order. Any objections to the form of the judgment must be filed within seven days thereafter.

The Court notes that although Defendants are jointly represented, the trial briefs were filed on behalf of Defendant Dearborn only. The parties are directed to address the status of Defendant Amgen, Inc. Life Insurance Plan.

**IT IS SO ORDERED.**

**DATED:** January 26, 2023

_____
The Hon. Josephine L. Staton
United States District Judge